IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES RANDALL ENO, | ) | CASE NO. 4:11CV3204 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401, *et seq.*

**PROCEDURAL BACKGROUND**

The Plaintiff, James Randall Eno, filed for disability benefits on March 30, 2007. (Tr. 153-160.) He alleged that he has been disabled since February 24, 2005, due to problems with his shoulder disc, right arm, back and feet. (Tr. 178.) His application was denied, and an administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on August 5, 2009. (Tr. 29-76.) On October 22, 2009, the ALJ issued a decision concluding that Eno is not "disabled" within the meaning of the Act and therefore is not eligible for disability benefits. (Tr. 19-28.) The ALJ determined that, although Eno suffers from severe impairments and is unable to perform his past relevant work, he can perform other jobs. (Tr. 21-28.) On April 8, 2011, the Appeals Council denied Eno's request for review. (Tr. 7-10.) Eno now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1.)

Eno claims that the ALJ's decision is incorrect because the ALJ failed to: give the treating physician's opinion proper weight; find that Eno cannot perform sustained, full-time work; pose a proper hypothetical question to the vocational expert; account for the side effects of Eno's medications; and find Eno 's testimony credible.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits should be affirmed.

## FACTUAL BACKGROUND

**Documentary Evidence**

In 1998, Eno's right foot was crushed at work and his right second toe was amputated. (Tr. 249, 256.) The amputation resulted in a bit of residual antalgia in his gait and some deformity in his right foot. Following the injury, he worked until February 23, 2005, performing work that involved repetitive and heavy manual labor associated with pouring iron at the foundry where he worked. (Tr. 256.) Due to the nature of his work, he was treated for back, neck, right arm and bilateral elbow pain. (Tr. 250.)

In July 2005, Kelly Pierce, M.D., Eno's primary physician, treated his complaints of neck, back, and foot pain from previous injuries. Eno's physical examination was normal, except for slight discomfort when his neck was manipulated. (Tr. 402-03.) Although Eno had symptomatic neuropathy, the physical examination revealed sensation in his arms and legs. Dr. Pierce opined that Eno could do some moderate activities, but needed to be mostly sedentary and not lift more than twenty-five pounds. (Tr. 403.) Later that month, a magnetic resonance imaging ("MRI") scan of Eno's cervical spine showed moderate central spinal stenosis at one level and foraminal narrowing at three levels. (Tr. 321-22.)

In August 2005, upon referral from Dr. Pierce, Daniel Ripa, M.D., an orthopedic specialist, examined Eno for complaints of neck, back, and right arm pain. (Tr. 256-57.) Eno stated that his problems began in November 2004 when he was injured at work and became disabling in February 2005, leading to his alleged disability. He tried physical therapy for two months and chiropractic treatments. Upon physical examination, Dr. Ripa observed that Eno moved relatively slowly. He had increased pain with neck rotation and decreased ability to tilt and rotate his neck to the right. He had diffuse weakness in the left arm compared to the right. Dr. Ripa found positive symptoms on the ulnar nerve on his left arm, but not his right. There was no evidence of significant atrophy or swelling in either arm, and his arm strength was good. (Tr. 256.) Dr. Pierce diagnosed the following: cervical disk herniation at C5/6; a questionable free fragment of disk extending posterior to the C6/7 level; a bulging disk at C 3/4; and a questionable cubital tunnel, left elbow. After reviewing Eno's cervical MRI findings, Dr. Ripa referred Eno to James Bobenhouse, M.D., a neurologist. (Tr. 257.)

In September 2005, Dr. Bobenhouse examined Eno. (Tr. 248-250.) His neck was tender to palpation and he had decreased motion in his neck. He had decreased pin prick sensitivity in the right fifth finger and the ulnar aspect of the palm of his hand, but normal sensation in his left hand. He had normal fine motor coordination and normal muscle strength and tone. (Tr. 249.) Nerve conduction studies and an electromyography ("EMG") of the right arm "showed evidence of a mild right ulnar neuropathy at Guyon's Canal [ulnar nerve]" but "no definite evidence of radiculopathy or plexopathy." (Tr. 250.) Dr. Bobenhouse diagnosed right ulnar neuropathy at Guyon's Canal, chronic cervical and lumbar pain secondary to degenerative arthritis, bilateral elbow pain secondary to lateral

epicondylitis (right worse than left), and a history of hypothyroidism. The doctor recommended physical therapy with cervical traction and a possible increase in Neurontin for his arm pain and neck discomfort. (Tr. 250.)

When Eno returned to Dr. Ripa in October 2005, he had not begun his recommended physical therapy. Dr. Ripa noted that Eno had pursued "very little in the way of significant treatment for his complaints" and noted that Eno was "somewhat less than ideally motivated to take control of his health care in [that] regard." (Tr. 254, 255.) He agreed with Dr. Bobenhouse that Eno should resume physical therapy. (Tr. 255.)

From 2006 to 2008, Dr. Pierce periodically filled out checklist forms to aid Eno in obtaining private disability benefits. (Tr. 270-74, 325-32, 369-70.) She opined that Eno could lift and carry no more than ten pounds occasionally and frequently. (Tr. 271-72, 274, 369.) Dr. Pierce stated that Eno could sit, stand, and walk for less than one hour at a time and two hours total during an eight-hour workday and needed to rest for five to ten minutes every thirty minutes as he changed positions. (Tr. 271-72, 274, 325, 331, 369, 371.) She opined that Eno needed complete freedom to rest frequently without restriction. (Tr. 325, 369.) Dr. Pierce stated that Eno's ability to reach, handle, feel, push, and pull were affected by his impairments. (Tr. 271-72, 274, 332, 369.) Eno had very little capability to climb, kneel, crouch, stoop, balance, or crawl. (Tr. 271-72, 274, 331, 369.) He was not to work around heights, moving machinery, or temperature extremes. (Tr. 370.) Dr. Pierce opined that between 67 and 100 percent of the time, Eno's pain impaired his ability to function and interfered with his ability to complete tasks in a timely manner. (Tr. 326.) According to Dr. Pierce, Eno's impairments or treatment would cause him to be absent from work more than two days each month. (Tr. 326, 330.)

In September 2007, Eno complained to Dr. Pierce of pain in the morning and with increasing activity in his right foot, shoulder, neck, and right arm. Dr. Pierce noted that Eno developed hypothyroidism following his treatment of hepatitis C. She told Eno to return for followup every twelve weeks or sooner if he experienced problems. (Tr. 347.)

In October 2007, Bruce Bednar, a registered and licensed occupational therapist, performed a physical consultative examination of Eno in connection with his application for disability benefits. (Tr. 350-53.) The physical examination revealed: good muscle strength; a normal gait with no significant limp due to his prior right foot injury; decreased balance in the right foot; low fine motor coordination and an ability to perform simple grasping and low speed assembly tasks as measured by the Purdue pegboard test; and an ability to sit and stand, walk short distances, and climb stairs occasionally, though he should be allowed to change positions periodically in order to perform light activities. (Tr. 350.) He had diminished light touch in both hands as well as diminished protective sensation in the first and second digit of the right hand. Mr. Bednar noted that the callouses, dirt, and grease on Eno's hands could have contributed to decreased light touch. (Tr. 351.) Mr. Bednar also noted that Eno's grip strength suggested submaximal effort. (Tr. 352.) He could perform light activities when being able to change positions. (Tr. 352-53.) Mr. Bednar stated that Eno should be in a more sedentary type job due to his limitations in standing and weight-bearing on his right foot. Mr. Bednar concluded that Eno had minor inconsistencies in physical effort with hand testing. He noted that the condition of Eno's hands indicated that he did a fair amount of activity, which was inconsistent with his subjective reports. Mr. Bednar reported that his clinical observations and findings were inconsistent with Eno's reported pain level. Eno appeared to exaggerate his pain level, sat

5

frequently with his right leg crossed with his ankle at the left knee, and did not demonstrate any significant difficulty transferring in and out of a chair onto the treatment table. Mr. Bednar noted that Eno smelled of alcohol. (Tr. 353.)

In an October 2007, RFC assessment, Glen Knosp, M.D., noted that although Eno sometimes used a cane it did not appear to be medically indicated. Eno's gait was normal. (Tr. 367.)

Eno's daughter completed a questionnaire. She stated that Eno prepares meals, helps care for his grandchildren, sometimes goes to the movies, runs errands for a couple of hours, and helps clean the house. (Tr. 226, 228.)

In completing a report regarding his daily activities, Eno also stated that he does some cooking and cares for the grandchildren. He added that he can drive for up to four hours and walk one mile. (Tr. 229-30.)

**Plaintiff's Testimony**

At the time of the hearing before the ALJ, Eno was forty-nine years old. He graduated from high school and attended some community college. (Tr. 39.) His work history included simple manufacturing, machine operation, heavy equipment operation, heavy equipment repair, carpentry and brick laying. (Tr. 40.) His longest period of employment was at Deeter Foundry for twelve years. He testified that he left Deeter when his shoulder problem started, his hip went out, and Deeter violated his work restrictions by requiring him to take a "standing" job and be on his feet six hours daily. (Tr. 41, 44.) Eno stated that he crushed his right foot, resulting in a worker's compensation case that settled in 2001 or 2002. He stated that he had a 38 percent lower extremity impairment rating for his foot. (Tr. 42-43.) After his foot injury, Eno returned to work as a crane operator. (Tr.

43.) Eno stated that if Deeter would have allowed him to sit on a forklift he could have continued to work there. (Tr. 44.) When asked if he could do a "sitting job" why he did not seek other employment, Eno stated he did not do so because of problems with his right arm. (Tr. 45-46.)

Eno stated that he lost his health insurance in January 2007. (Tr. 46-47, 58.) He receives massages for his arm once or twice weekly. (Tr. 47.) Eno supports himself on his private disability insurance, which pays him $1,831 monthly. (Tr. 36-37, 47.) His medications cost $200 a month. (Tr. 37.) At home he performs occasional chores such as painting the house and replacing windows and screens. (Tr. 48.) Otherwise, Eno described his daily activities as consisting of watching television, doing dishes and laundry, and helping his daughter with her two children aged six and two. (Tr. 48-49, 59.) Eno is single, and his daughter lives with him. (Tr. 39, 48.) The children go to daycare, but Eno helps get them ready in the morning. (Tr. 50.) Eno stated he walks daily with a cane that he has had for ten years, but it does not appear to be prescribed. (Tr. 50-51.) He stated that he uses an inversion table ane takes medications, which cause side effects. (Tr. 56.)

Eno addressed his alcohol use,[1] stating that he had not had anything alcoholic to drink in two weeks. However, prior to that he drank daily and considers himself to be an alcoholic. (Tr. 51.) His reason for drinking was to "ease the pain." (Tr. 57.) He is aware he should not drink due to his hepatitis C. (Tr. 61.) At the time of the hearing he stated he had been attending Alcoholics Anonymous ("AA") meetings weekly for six weeks. (Tr.

---

[1] Eno's attorney stated at the hearing that Eno's alcohol use was not material to his claim. (Tr. 38.)

7

51.) He had his first arrest for driving under the influence in May and had not been sentenced yet. He was prompted to go to AA meetings by his attorney. (Tr. 52.)

Eno stated that he has massages and has been to a chiropractor, but he has not had physical therapy since October 1, 2005. (Tr. 53.) Eno stated that while he had health insurance Dr. Ripa recommended back surgery, while Dr. Bobenhouse recommended physical therapy. (Tr. 54, 58.) He stated that the doctors agreed on surgery after he lost his health insurance. (Tr. 58.) Eno has not pursued surgery.[2] (Tr. 54.) He sees Dr. Pierce two or three times annually. (Tr. 59.) He testified that he could walk or stand for twenty minutes and sit for an hour. He stated that then he experiences spasms and has to lie down. (Tr. 57.) Eno stated that he no longer feels he can do a sitting job because he would have spasms from sitting too long. (Tr. 59.)

**Medical Expert's Testimony**

The medical expert, Morris Alex, M.D., a specialist in internal medicine, testified after reviewing the medical evidence of record. He considered various listings and explained why Eno did not meet any particular listing. (Tr. 62-65.) Dr. Alex found that Dr. Pierce's findings were inconsistent with her own progress notes and the other evidence of record. (Tr. 65, 68, 70.) He agreed with the opinions of the state agency medical consultants that Eno could perform modified light work. (Tr. 66.) He opined that Eno could use his arms frequently for handling, fingering, and feeling, but could not perform these movements constantly. He should avoid extreme cold, extreme heat, high humidity, vibrations, ladders, ropes and scaffolds. (Tr. 66-67.) In addition, the medical expert noted

---

[2]The medical evidence does not indicate that surgery was recommended.

that examining sources have indicated that Eno was neurologically intact. (Tr. 67.) Dr. Alex confirmed that he was not giving controlling weight to Dr. Pierce's opinion because it was not supported by other evidence in the record. (Tr. 70.)

**Vocational Expert's Testimony**

The vocational expert ("VE"), Steven Kuhn,[3] testified in response to a hypothetical question posed by the ALJ, outlining Eno's age, education, work experience, and work-related limitations. (Tr. 70-75.) The hypothetical individual had limitations identical to those included in Eno's RFC. (Tr. 71-72.) Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could perform representative occupations of a cleaner, a general office clerk, and a cashier. (Tr. 72-73.) The vocational expert also testified that an individual with Eno's limitations could perform between 80 and 90 percent of light and sedentary jobs. (Tr. 73.) If either Eno's subjective complaints or the limitations in his treating physician's opinion had been adopted, the vocational expert testified that an individual with those limitations would not be capable of performing work. (Tr. 74-75.)

**The ALJ's Decision**

After following the sequential evaluation process set out in 20 C.F.R. § 404.1520, the ALJ concluded that Eno was not disabled. (Tr. 28.) Specifically, at step one the ALJ found that Eno had not performed substantial gainful work activity since his alleged onset date of February 24, 2005. At step two, the ALJ found the following severe impairments: hypothyroidism; degenerative disc disease of the lumbar and cervical spine; and a history

---

[3]Mr. Kuhn's surname is misspelled in the record as "Combe." Mr. Kuhn's curriculum vitae appears in the record. (Filing No. 136-137.)

of hepatitis C. At step three, the ALJ found that Eno's impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 21.) The ALJ determined that Eno had the residual functional capacity ("RFC") to perform modified light work as he could: lift and carry up to twenty pounds occasionally and ten pounds frequently; and occasionally crouch, crawl, stoop, bend, climb, balance and kneel. He stated that Eno must avoid overhead reaching with both arms as well as extreme cold, heat, humidity, vibrations, hazards, and dangerous equipment and machinery. Eno cannot work on ladders, ropes or scaffolds and is able to frequently but not constantly handle, finger and feel with his right arm and hand. (Tr. 21-22.) At step four, the ALJ determined that Eno did not possess the RFC to perform any of his past relevant work. (Tr. 27.) The ALJ concluded that Eno had skills from his past relevant work that were transferable to other occupations with jobs existing in significant numbers in the local and national economies, such as a cleaner, general office clerk[4] and cashier. (Tr. 27-28.) In summary, the ALJ found that Eno was not disabled. (Tr. 28.) The ALJ found that Eno met the insured status requirements of the SSA through December 31, 2010. (Tr. 21.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the

---

[4]The ALJ's opinion mistakenly states office "cleaner." However, the ALJ referred to the DOT regulation describing a general office clerk.

record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

### I.   Treating Physician's Opinion

Eno argues that the ALJ erred in failing to give more weight to the opinion of his treating physician, Dr. Pierce. The Eighth Circuit Court of Appeals has stated the following:

> Generally, "[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." However, "[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."

*Renstrom v. Astrue,* 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Perkins v. Astrue,* 648 F.3d 892, 897-98 (8th Cir. 2011)).

As the ALJ noted, Eno sees Dr. Pierce biannually primarily for the purposes of having Dr. Pierce complete paperwork to ensure that Eno continues to receive his private disability benefits and for medication refills. The medical expert who testified at the hearing, Dr. Alex noted that discrepancies exist between Dr. Pierce's completed checklists and her progress notes. The ALJ agreed, finding that the seven checklists are "essentially duplicates" and are inconsistent with objective findings and Eno's testimony. The ALJ explained:

> Dr. Pierce has restricted claimant to less than sedentary work, but there is nothing in the file to suggest claimant has any such restriction. . . . [S]urgery has never been indicated. His impairments are controlled by medications. Admittedly he may not be able to return to his previous work, but the step 5 analysis undertaken herein is appropriate, especially where claimant affirms he can do a sitting down job.

(Tr. 26.)

The forms completed by Dr. Pierce reflect that Eno is capable of very limited activity. (*See, e.g.*, Tr. 270-74, 326, 331-32, 369-71.) A review of Dr. Pierce's medical records shows that Eno was experiencing pain at different times in his back, neck, right wrist and right foot. However, in her treatment notes Dr. Pierce routinely noted that Eno was in "no acute distress" and had no swelling, and she made very few changes in Eno's medications over the years that she treated him. (Tr. 270-274, 290-324, 347-348, 372-386.) She did note at least once that Eno was drinking alcohol more than he should especially in light of his hepatitis C, and on one occasion noted that he had stopped his medications. (Tr. 378, 398.) On one occasion, Dr. Pierce wrote a note to excuse Eno from jury duty in which she stated that he could not sit, stand or walk for more than two hours without changing position. (Tr. 379.) That assessment differs from those provided on other occasions in

which Dr. Pierce stated that Eno could sit, stand or walk for one hour or less than one hour. (Tr. 331, 369.) A review of all of Dr. Pierce's records show that the purpose of Eno's visits was generally to obtain disability paperwork. Few remarkable notes were made. A striking discrepancy exists between the forms completed by Dr. Pierce and her clinical notes, and discrepancies even exist among the various forms she completed. These numerous and material inconsistencies undermine her credibility. Her opinions are also inconsistent with other credible medical evidence in the record, such as the opinion of the consulting evaluator, Mr. Bednar. Mr. Bednar concluded, based on his examination and observations, that Eno could work at a "more sedentary" job. Bednar found that his own clinical findings and observations did not suggest the amount of pain reported by Eno. (Tr. 352-53.) In summary, Dr. Pierce's opinions lack credibility in light of the inconsistencies between her checklists and treatment notes and between her checklists and other medical evidence in the record.

## II.   Hypothetical Question

Eno argues that the hypothetical question posed to the VE was defective because it failed to include references to Eno's use of a cane, the effects of his hepatitis C, and Eno's fine manipulation abilities.

"'A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.'" *Perkins v. Astrue,* 648 F.3d 892, 901-02 (8th Cir. 2011) (quoting *Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005) (quoting *Hunt v. Massanari,* 250 F.3d 622, 625 (8th Cir.2001))). "The hypothetical question must capture the concrete consequences of the claimant's

13

deficiencies." *Hunt,* 250 F.3d at 625.  However, "the ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." *Id.*

Regarding Eno's use of a cane, there is no evidence in the record that the cane was medically indicated.  Eno chose to use it.  His gait was routinely described as normal.  There is no evidence or law supporting the proposition that Eno's occasional use of a cane by choice is dispositive of a finding of disability or a lack of ability to perform light work.  Therefore, it was unnecessary for the hypothetical to reference Eno's use of a cane.

Eno argues that the hypothetical did not include side effects of his hepatitis C, which was not alleged to be a significant factor in Eno's disability application or during the course of his medical treatment.  He did not complain of hepatitis symptoms at the hearing.  He has not sought treatment for liver symptoms since he was treated for hepatitis C, and he continued to drink alcohol despite being warned not to do so.  Eno alleged in his brief in support of this appeal that he suffers fatigue and joint pain as a result of his hepatitis.  The hypothetical did not include a reference to side effects of hepatitis C because the side effects now complained of were not supported by the evidence in the record.

Finally, Eno argues that the hypothetical did not include limitations of his ability in performing fine manipulations or the speed with which he can perform those activities.  The consultative examiner found some deficits in his fine motor coordination.  The hypothetical question posed to the VE specifically included "frequent but not constant handling, fingering and feeling."  (Tr. 72.)  Therefore, the hypothetical included Eno's fine manipulation symptoms to the extent they were supported by the record.

### III. Side Effects of Medications

Eno argues that the ALJ failed to consider the side effects of his medications when determining his RFC and when questioning the VE. Specifically, Eno refers to Hydrocodone, Synthroid and Neurontin. Eno alleges that he experiences fatigue, dizziness, muscle weakness and confusion due to his medications. The record reflects that Hydrocodone was only prescribed as needed. The record also shows that Eno complained in reports at various times of the following side effects: diarrhea (Tr. 183, 193); dizziness, stomach problems, and light sensitivity (Tr. 211); and light-headedness (Tr. 232).

In determining a claimant's RFC, one factor the ALJ must consider is "the dosage, effectiveness and side effects of any medication." *Perks v. Astrue,* No. 11-3041, 2012 WL 3168495 (8th Cir. Aug. 7, 2012); *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). However, an ALJ "'need not explicitly discuss each Polaski factor.'" *Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir.2005)). A hypothetical question posed to a vocational expert "'must include those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Id.* at 561 (quoting *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996).

In Eno's case, the ALJ considered the side effects described by Eno at the hearing as clumsiness, confusion and dizziness. (Tr. 23, 56.) However, the ALJ viewed Eno's statement of the side effects as not credible to the extent that they are inconsistent with his RFC. In other words, the ALJ considered the side effects and found that Eno is nevertheless capable of light work with the stated limitations. Also, the record does not support Eno's recent allegations regarding side effects of his medications. For these

15

reasons, the ALJ was not required to include them in the hypothetical question posed to the vocational expert.

### IV. Plaintiff's Credibility

Eno argues that the ALJ erred in assessing his credibility. Specifically, Eno argues that the ALJ erred in using his alcoholism to discredit him when his alcoholism was not a material contributing factor to his disability. Eno also addresses the ALJ's "insinuation" that he lacks incentive to work because he receives $1,831 per month in private disability funds while not considering Eno's lack of health insurance. Eno also mentions the ALJ's reliance on Mr. Bednar's observations of Eno's calloused, greasy, and dirty hands as indicating he was engaging in activities similar to work. Eno argues the ALJ drew an improper inference of nondisability from the fact that Eno did not have surgery on his arm and his condition is controlled by medications. Finally, Eno argues the ALJ improperly relied on one comment by Dr. Bednar that Eno did not use his maximum effort during the consultative examination to discredit all of the test scores recorded by Mr. Bednar.

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.'" *Juszczyk v. Astrue,* 542 F.3d 626, 632 (8th Cir.2008) (quoting *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir. 2003)). In *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984), this court set forth a number of factors an ALJ must consider in assessing a claimant's credibility: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective

medical evidence to support the claimant's complaints." *Moore V. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009). "When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski* factors." *Dipple v. Astrue,* 601 F.3d 833, 837 (8th Cir.2010). "[A]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Wiese v. Astrue,* 552 F.3d 728, 733 (8th Cir.2009).

In Eno's case, the ALJ concluded that Eno's statements were not credible to the extent that they were inconsistent with the RFC assessment. In reaching this decision, the ALJ considered: Eno's daily activities, work history, and pain; his receipt of $1,831 monthly in private disability payments as well as the $200 he spends monthly on medications; his alcoholism; how Eno relieves his pain; and the side effects of his medications. An ALJ need not methodically list each *Polaski* factor. Rather, the ALJ may generally consider the factors, as the ALJ did here. *See, e.g., Pelkey v. Barnhart,* 433 F.3d 575, 578 (8th Cir. 2006). In summary, the ALJ adequately considered the *Polaski* factors in making her decision regarding the credibility of Eno's testimony.

**V.   RFC**

Eno argues that the ALJ erred in determining his RFC. Specifically, Eno contends the ALJ incorrectly determined that he is capable of full-time work.

"'The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Lacroix v. Barnhart,* 465 F.3d 881, 887 (8th

...

Cir.2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir.2004)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue,* 524 F.3d 872, 875 (8th Cir.2008) (quoting *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir.2007)).

In determining Eno's RFC, the ALJ considered all relevant evidence, including treatment notes, consultative evaluations, and Eno's testimony. The Court notes, as the ALJ did, Eno's testimony that if he had been allowed to sit and run a forklift at Deeter he could have continued working. In summary, the ALJ considered the relevant evidence and did not err in determining Eno's RFC.

Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment will be entered in a separate document.

DATED this 15th of August, 2012.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge